## Fox et al. *versus* Reed.

</div>

1. A demurrer by plaintiff to a garnishee's answers in foreign or execution attachment is a proper way of bringing a case to a hearing on the answers.

2. The plea of *nulla bona* by a garnishee is good for nothing when the plaintiff sets the case down for hearing on the answers.

3. That the defendant in the judgment had not been notified of the attachment, can never be an issue to the jury.

4. The want of notice or service is cured by actual appearance.

5. A plea of set-off, of plaintiff's bonds held by a defendant, ought to be as special as a declaration in debt on the bonds, and should specify the very bonds on which a recovery is claimed by way of set-off.

6. A plea of set-off, defective in that it does not describe any particular bonds to be set off, may be taken advantage of by general demurrer.

7. A defendant corporation cannot claim that its funds are exempt from the process of its creditors because it needs them for the repair of its works, or has by resolution set them apart for that purpose.

8. A depositary of the funds of a corporation has no legal right to set off corporation bonds held by him so as to satisfy or discharge the debt owed by him as such depositary, and therefore he cannot set them up against any creditor of the company.

9. A garnishee cannot set up as a defence to a judgment against him, matters which only interest the defendant, and do not interest him as garnishee.

ERROR to the Court of Common Pleas of *Erie County*.

Execution attachment.

The plaintiffs were owners of a large amount of the bonds

[Fox et al. *v.* Reed.]

of the Erie Canal Company, issued for the construction of their canal. Upon these plaintiff obtained a judgment against the company on the fourth day of June, 1857, for the sum of $15,225 39. On the same day plaintiffs issued their attachment execution under the act of 16th June, 1836, and attached moneys, goods, &c., in the hands of Charles M. Reed and others, and summoned them as garnishees. All of the officers of the company were made garnishees, Charles M. Reed being president thereof. No return of service was made upon them as officers of the company. The company appeared by attorney soon after the service of the attachment, and the president appeared, and for the company moved on the 2d of January, 1858, to quash the attachment.

The plaintiffs filed interrogatories, which were answered by Charles M. Reed. The material answers were the following. After giving the names of the directors, and stating that he is president, he says:—

"To the third interrogatory he answers and says: That he never loaned from the Erie Canal Company any of its money or funds, or any part thereof, nor has he at any time held said money or funds under any contract or agreement with the said Erie Canal Company.

"The treasurer of the said company made an arrangement with this respondent, on or about the second day of May, A. D. 1853, to deposit with him the funds of the said company for safe keeping. The arrangement between the treasurer and this respondent was that an interest account was to be kept by the treasurer with this respondent (as responsible bankers in Erie were willing to receive the treasurer's deposits upon such terms), and at the end of each year charge over the balance of interest to the account of this respondent, the same as the money deposited from tolls and water rents. The interest was not suffered by the treasurer to accumulate in this respondent's hands, but was subject to the check of the treasurer, the same as any other money on deposit. From the time navigation opened in the spring, until the close in the fall each year, deposits were made as received by the treasurer from the collectors, and during the season of business on the canal, the deposits considerably exceeded the expenditures. Near the close of the year the treasurer would make his report to the board of directors of the amount of money in the treasury, and in that report always included the balance of interest charged upon deposits made with this respondent, the same as money received for tolls. At or about the same time the superintendent makes his annual report of the condition of the canal, and his estimate of the necessary amount of money required to be expended through the winter and spring to put the canal in the proper condition for the next

season's business.   Upon the report of these officers, the board of directors always appropriated the entire amount in the treasury—first, to the repairs and ordinary expenses of the canal; secondly, the balance to the payment of interest on the bonds and certificates of indebtedness of the company, except for the year ending December 31, 1855, when the company was unable to pay any interest.   The appropriation of fifty thousand dollars to rebuild the aqueducts hereinafter mentioned, will not be adequate to finish the work.   Additional appropriations will have to be made for that work.

"The treasurer, in making his deposits with this respondent, stipulated for no particular amount, nor any specified time the same should remain on deposit, but it was subject to be paid on call, and was always so paid.

"This respondent received no money, nor had he at the time of the service of the attachment, or at any time since, any money in his hands belonging to the Erie Canal Company, in any other way than as the depositary of the treasurer in the manner above stated.  The said arrangement was one exclusively between the treasurer and this respondent for the safe keeping of the money in the treasury, to which the company was no party, nor had anything to do with."

"To the sixth interrogatory he answers and says: That he was not indebted to the Erie Canal Company at the time of the service of said attachment or since, but that said' company is and has been for many years past indebted to this respondent in the sum of two hundred thousand dollars and upwards—and that the said company is insolvent.

"To the seventh interrogatory he answers and says: That there was deposited with him by the treasurer of said company the sum of fifty thousand dollars, which had been appropriated and set apart by the board of directors specially for the rebuilding of the Elk Creek and Walnut Creek aqueducts—which sum the treasurer deposited with this respondent, as before stated—but this respondent says there never was any arrangement between him and said company in relation to said money, it was exclusively between him and the treasurer for the safe keeping of the money.   The money was not loaned to this respondent, simply deposited with him to be paid on call. How the accounts stood at the time of the service of the attachment between this respondent and the treasurer, he is now unable to state with certainty, nor can he state how they were until he makes his annual settlement with the treasurer, which is always made about the 28th or 29th of December in each year.   This respondent says there was no money in his hands at the time of the service of the attachment, nor at any time since, other than as the depositary of the treasurer.   As

this respondent has before stated, the treasurer commenced to deposit with him on or about the 2d day of May, 1853—from that time since, the amount in the treasury varied nearly weekly. In the spring of the year, after paying the pro rata dividend of interest and the repairs of the canal through the winter, the treasury would be nearly empty, and in some instances the treasurer would have to anticipate a part of the revenue of the coming season. That was always so whenever there was a break or breaks in the canal and there were extraordinary repairs to be made. The directors being desirous to pay the creditors as large a dividend as possible, frequently declared more than there was means to pay, and the result was that repairs done in the winter would have to remain unpaid, until the receipt of tolls the following spring. *This respondent did agree to pay at the rate of six per cent. interest on balances in his hands, and did so account with the treasurer.* This respondent is not the treasurer of said company, but is the bail of the treasurer. He refers to his answer to the plaintiff's third interrogatory for a full statement of the matters connected with this answer.

" To the second additional interrogatory, he answers and says: That the fifty thousand dollars in said interrogatory mentioned, has never been drawn or lifted by said treasurer out of the hands of this respondent since it was first deposited with him. That on the first day of January, A. D. 1856, he gave the said treasurer a certificate for the same in the following words: '50,000. Received from David McAllaster, Treasurer of Erie Canal Company, fifty thousand dollars, being the amount of fund appropriated by said company for the rebuilding of the Elk Creek and Walnut Creek Aqueducts, and upon which I am to pay interest until called for. Signed, CHAS. M. REED. Erie, January 1, 1856.' Which said sum of fifty thousand dollars has remained ever since the date of said receipt in the hands of this respondent undrawn, except so much as has been applied on the contract for rebuilding the Elk Creek Aqueduct within the last four months."

" To the fourth additional interrogatory he answers and says: That fifty thousand dollars was received and kept in a separate and particular account in the manner specified in his answer to the second additional interrogatory, and was never subject to a draft for any other purpose than that for which it was specifically appropriated. There was nothing to prevent the treasurer, at any moment of time he saw fit, to withdraw all the money which was on deposit with this respondent; he was only the depositary of the treasurer, and all the funds were subject to be withdrawn at the will and pleasure of the treasurer."

To these answers plaintiffs demurred formally that they were

[Fox et al. *v.* Reed.]

not sufficient in law to prevent judgment against the garnishee, and prayed judgment, &c.

At this stage of the case, on the 24th January, 1860, James C. Marshall, Esq. withdrew his appearance for the defendant canal company, and on the next day appeared specially for Charles M. Reed, garnishee.

August 25, 1860, the garnishee filed three formal pleas. 1st. *Nulla bona;* 2d. That the defendant company was not served; and 3d. "That the plaintiffs ought not to have or maintain their said process of attachment in execution against him, the said Charles M. Reed, because he says that the Erie Canal Company, before and at the time of the service of the attachment and ever since, to wit, at the county of Erie aforesaid, was and still is indebted to the said Charles M. Reed in a large sum of money, to wit, the sum of three hundred thousand dollars, lawful money of the United States, by the bonds of the Erie Canal Co. The said Charles M. Reed held, at the time of the service of the attachment in this case, and for a long time before, and now holds the bonds of the said Erie Canal Company, due and payable the first day of January, A. D. 1850, to the amount or sum of three hundred thousand dollars, which said sum of three hundred thousand dollars is still due and unpaid, and which sum far exceeds any sum of money belonging to the said Erie Canal Company in the hands of Charles M. Reed, at the time of the service of said attachment or at any time since, or any indebtedness from said C. M. Reed to the Erie Canal Company; and out of which said sum of three hundred thousand dollars so due and owing from the said Erie Canal Company to the said C. M. Reed, he the said C. M. Reed is ready and willing and hereby claims the right to set off and allow to the Erie Canal Company the full amount of any and all sum or sums of money in the hands of him, the said C. M. Reed, at the time of the service of the said attachment and at any time since, according to the form of the act of assembly in such case made and provided, and of this the said C. M. Reed puts himself upon the country."

Plaintiffs replied that garnishee was estopped by his answers admitting funds in his hands, from pleading the first plea; that he was precluded by appearance of the company, by attorney, and by himself as president, from making the second plea; and demurred generally to the third plea.

After argument, the court, DERRICKSON, J., entered the following judgment.

"And now, Sept. 25, 1861, it is ordered that judgment be entered for the defendant on his answers, and more especially on his claim of set-off."

The entry of judgment was the error assigned.

[Fox et al. *v.* Reed.]

*Benjamin Grant* (with whom was *J. Ross Thompson*), for plaintiffs in error.

The questions properly before the court for. adjudication, are :—

1. Was the attachment properly served, or did the company or garnishee do any act which in law waived a service ?

2. Had Gen. Reed any funds of the defendant in his hands ?

3. Is defendant's plea of set-off well pleaded ?

4. Has defendant a right to set off the bonds of the company held by him against the funds in his hands ?

Any defect in want of proper service, is cured by the appearance of the company.

A general appearance waives the necessity for a service of the writ. *Scott et al.* v. *Israel*, 2 Bin. 145 ; *Evans* v. *Meylert*, 7 Har. 410 ; *Stroup* v. *McClure*, 4 Y. 523 ; *McCullough* v. *Guetner*, 1 Bin. 214. Appearance by defendant is a waiver of both summons and return. *Church* v. *Church*, 5 W. & S. 217 ; *Skidmore* v. *Bradford*, 4 Barr, 300 ; *Malone* v. *Lindsey*, 1 Phila. Rep. 288 ; *Gracie* v. *Palmer*, 8 Wheat. 699 ; 1 T. & H. 224 ; *Denton* v. *Noyes*, 6 J. 302 ; *Jackson* v. *Stewart*, id. 37 ; 1 Salk. 86.

The fact of appearance is one that can only be tried by an inspection of the record. *Malone* v. *Lindsey*, 1 Phila. R. 288 ; *Field* v. *Gibbs*, P. C. C. R. 57.

We submit further that the matters contained in garnishee's second plea allege matters of defence that, if true, could only be pleaded by the defendant. "As garnishee he had no right to set up any defence for the company." *Per* LOWRIE, C. J., in *Reed* v. *Penrose*, 2 Grant's Cases, 485.

2. Had Gen. Reed any funds of the defendant in his hands?

We will try him by the record made by himself.

The attachment was levied July 3, 1857. Gen. Reed answers that at that time he had in his hands funds of the company to the amount of $70,076 67. He cannot now deny this. It is proved by the record, and "a record imports in itself such incontrovertible credit and verity that it admits of no averment, plea or proof to the contrary." Coke on Lit. 260 ; *Field* v. *Gibbs*, Pet. C. C. R. 157. Thus defendant is estopped by his own record, made under the sanction of his own oath, from pleading the matter contained in his first plea. The question is well decided against him in *Newlin* v. *Scott*, 2 Casey, 104.

3. Is defendant's plea of set-off well pleaded ?

We allege by our demurrer that the plea is bad, and that it will not stand an application of the well known rules of pleading. When a set-off is pleaded, the plea should not only contain all the requisites essential to the validity of other pleas in bar, but must describe the debt intended to be set off, with

the same degree of certainty as is required in a declaration for a like demand. Barbour on Set off, 162; 1 Chit. Pl. 562; 2 Saund. Pl. 862. It should set forth with certainty the grounds of plaintiff's liability. *Irwin* v. *Potter*, 3 Watts, 271. It should have the substantial requisites of a declaration. 8 Munroe 84; *Gogel* v. *Jacoby*, 5 S. & R. 120; *Lewis* v. *Culbertson*, 11 S. & R. 48. It would be dangerous to allow a deviation from this rule, and to permit a defendant upon the statement of remote and conjectural possibilities to enter into the pursuit of a defence, rather than the proof of one; *Irwin* v. *Potter*, 3 Watts, 275.

The plea is also bad in this that it introduces new matter and concludes to the country. It is an established rule that whenever new matter is introduced, the pleading must conclude with an averment. 1 Chit. Pl. 642; *Hampshire Banking Co.* v. *Billings*, 17 Pick. 87; *Curray* v. *Stephenson*, Cath. 337; *Cowper* v. *Towers*, 1 Lut. 101; *Filewood* v. *Popplewell*, 2 Wils. 66; *Chandler* v. *Roberts*, Doug. 60; *Henderson* v. *Withy*, 2 T. R. 576; Moore, 386; 3 Leo. 165.

Does defendant's plea stand the test of these rules? The plea alleges that the Erie Canal Company were indebted to him in the sum of $300,000 by their bonds, which he held at the time of the commencement of this proceeding, and that said bonds were due and payable Jan. 1, 1850, and that that sum is greater than the amount of money attached in his hands; and out of the sum of $300,000 so due and owing from the Erie Canal Company to him, he is willing and claims the right to set off and allow to the amount of money in his hands. He does not tell us, in his plea, what particular bonds he is willing and claims the right to set off. He does not inform us whether his bonds are for five dollars, or for five thousand dollars each, or whether their date is 1740 or 1840, nor what are their numbers—whether they bear interest—where payable—by whom signed—nor anything by which they may be identified. He may bring suit upon each or all of his bonds against the company, if he sees proper so to do, and a recovery cannot be prevented on the ground that they have been paid by being set off in this proceeding. Suppose the allegation is made, how is it to be proved? The record of this case is no evidence of it. The court cannot put their hands on any particular bond or bonds and say this has been paid by set-off in Fox & Van Hook's attachment. Or suppose he sell his bonds to an innocent purchaser, and he bring suit—what remedy have the canal company? They are negotiable in form, and by the courts of England and some of the sister States, bonds of this form are held to be negotiable in fact. This court has very nearly so decided in *Carr* v. *Le Fevre*, 3 Casey, 413. They pass from hand to hand without assignment or indorsement.

[Fox et al. *v.* Reed.]

The question whether these funds in his hands are liable to be attached, is not raised by the record; and if it was, is fully decided in our favor by the opinions of C. J. LOWRIE and J. STRONG, in *Reed* v. *Penrose*, 2 Grant's C. 486—491.

Is defendent entitled to set off the bonds of the company held by him against the funds in his hands? Suppose the court go beyond the pleadings and decide the case upon the answers as though no pleas had been filed, what sort of a case have we then? All the questions, we think, must be decided in our favor. All except that of set-off were so decided by the court below, and by the majority of this court in *Reed* v. *Penrose*. As to the question of set-off, we think, under the facts as contained in defendant's answers and affidavit, there can be no doubt. These answers are written evidence, and in the nature of a special verdict, except that they are to be construed by the court most strongly against the person making them, as it is to be presumed that whatever of fact there was in his favor in the case, would have been fully set forth. *Ament* v. *Sarver*, 2 G. C. 35.

Was there a contract on the part of the defendant when he received this money, or at any time after, that he would repay it in money? If he contracted to pay it back in money, certainly that contract would not be satisfied by a payment in depreciated bonds. *Reed* v. *Penrose*, 2 Grant, 486; *Hennis* v. *Page*, 3 Wh. 275. *Modo et conventio dat legem.* If there was a contract in the case under consideration, the law is subservient to it. *Trask* v. *The Insurance Company*, 5 Casey, 198.

Was there a contract? The mutual understanding of the parties—Gen. Reed and the canal company, or its treasurer, Mr. McAllaster, who acted for the company at the time Gen. Reed received the money; or even what the company and Mr. McAllaster, its treasurer, had a right to understand from the transaction and from Mr. Reed's action, and the whole matter taken together—is to be taken into consideration; and if Gen. Reed intended to pay the money (not depreciated bonds) on the check of the treasurer, or if Mr. McAllaster had a right from the facts of the transaction so to understand it, there was a contract on the part of Gen. Reed not to set off his bonds against the money in his hands. In the interpretation of contracts, the intention of the parties is to be ascertained from the terms they have used in connection with the facts of the case, and the agreement of the parties is to be enforced according to the sense in which they mutually understood it at the time it was made. 1 Chit. Cont. 73; 2 Pars. Cont. 11. The construction is to be *contra proferentem*, id. 18–19; *Myer* v. *Isaac*, 6 M. & W. 612. Mr. McAllaster was treasurer of the Erie Canal Company, and made this arrangement with Gen. Reed, by

which Reed was to take the money of the canal company and pay interest for it to the company, and pay his check whenever presented. McAllaster by his office was to receive all the funds of the company, and disburse them as the company might direct. Is it possible that either Gen. Reed or Mr. McAllaster intended to so dispose of the funds that the canal company would lose the means to perpetuate its own existence? It must, as we learn from the answers of Gen. Reed, and as we are taught by experience, have a large amount of funds every year to keep the canal in repair.

"A contract is to be determined in the sense in which the promiser believed that the promisee accepted the promise." Chit. Cont. 74. "This will not differ from the actual intention of the promiser where the promise is given without collusion or reserve." Id.; *Morey* v. *Haman*, 10 Vert. 567; *Putnam* v. *Clark*, 11 id. 583; *Gunnison* v. *Bancroft*, id. 493. The court will look to the motives that led to the contract, and the object intended to be effected by it. *Davis* v. *Barny*, 2 Gill & Johns. 382. The situation and true intent of all the parties and subject matter are to be considered in determining the meaning of a contract. *Wilson* v. *Troup*, 2 Cow. 195; *Sumner* v. *Williams*, 8 Mass. 214; *Fowle* v. *Bigelow*, 10 Mass. 379; *Hopkins* v. *Young*, 11 Mass. 302; *Howland* v. *Leech*, 11 Pick. 154; *Hollingsworth* v. *Fry*, 4. Dall. 345; *Patrick* v. *Grant*, 1 Shep. 233; *Littlefield* v. *Winslow*, 19 Maine, 394.

The law does not deny to the reader the same light and information that the writer enjoyed: he may acquaint himself with the persons and circumstances that are the subjects of the allusions and statements in the written instrument, and is entitled to place himself in the same situation as the party who made the contract—to view the circumstances as he viewed them, and so to judge of the meaning of the words and of the correct application of the language. Ad. Cont. 147; 1 Myl. & K. 602. Words as well as facts and circumstances should be construed *secundum subjectam materiam*. 3 B. & Ald. 642.

The best construction of a contract is that which is made by viewing the subject as the mass of mankind would view it, for it may safely be assumed that such was the aspect in which the parties themselves viewed it. *Schuylkill Nav. Co.* v. *Moore*, 2 What. 491; *Snyder* v. *Lebeingood*, 4 Barr, 305.

In the case under consideration there was a contract on the part of defendant to pay the money received from the canal company when called for, and the money was the consideration for the promise. Construed by the rules laid down, the contract was to pay in money. A large amount of the money had been appropriated for a special purpose. He received this money with the full understanding of that appropriation. Does not

[Fox et al. *v.* Reed.]

the resolution of appropriation form part of his contract? Would not receiving it with that kind of special knowledge, and under the special contract to pay it again on call, estop him from now setting up a different contract? His actions must be consistent. If this was a suit by the company direct, for the recovery of this money from defendant, does any person believe that he would attempt to set off his bonds? Would any court under the circumstances allow him to do so? The plaintiffs are substituted to all the company's rights. *Baldwin's Estate*, 4 Barr, 248; *Reed* v. *Penrose*, 2 G. C. 468.

The case of *Smuller* v. *The Union Canal Co.*, 1 Wright, 68, seems to rule this question in plaintiff's favor. Smuller had received the money for which he was sued, after it had been appropriated to a particular purpose. Mr. J. STRONG says, "his receipt of the money for the defined use amounts to an agreement not to apply it to any other, and of course not to his own use by pleading a set-off."

In *The Bank* v. *McCallister*, 9 B. 475, the funds had been deposited for a special purpose, with notice of the purpose for which they were designed by the bank. The court refused to allow the bank to set off a debt from the depositor. Is there any distinction to be made between that case and this? Gen. Reed received the money with full notice of its ultimate use, agreeing to pay interest for it until called for, for that special purpose. In the case of *The Bank* v. *McAllister*, the money was by an implied contract to be paid out on the check of the treasurer of Illinois. In our case the money was by positive contract to be paid on the check of the treasurer of the Erie Canal Company, to whose rights plaintiffs are subrogated.

The same principle is decided in *Parkist* v. *Alexander*, 1 Johns. C. R. 397.

The garnishee contends that he is only the depositary, or bankee for the treasurer. It is of the essence of the contract of deposit that it should be gratuitous on the part of the depositary. 9 M. & R. 470; 1 Bour. Law Dic. 445; Whart. L. Dic. 269.

The garnishee paid six per cent. interest on the money in his hands, hence it lost its character of deposit, and was a loan, and liable to attachment.

The impropriety of allowing this claim of set-off is proved by a reference to its results.

In the first answer to plaintiffs' additional interrogatories, defendant says that on the 25th January, 1858, he had in his hands money of the canal company to the amount of $78,120.11. He has had ample opportunity and time to exchange this amount of cash for bonds at their depreciated value. At twenty-five cents on the dollar for bonds, the price at which

[Fox et al. *v.* Reed.]

they have been selling, it would purchase $312,480 44—a sum larger than he claims to have by his answers of $12,480 44. It is not improbable that the money has been thus disposed of. He now asks leave to pay this debt of $78,120 11 with that amount of bonds, which leaves him as the profit of the transaction the sum of $234,460 33, in the bonds of the company. He says in his answers that they pay from two to four per cent. interest each year on the face of the bonds. Suppose we take the medium and estimate interest at three per cent., and we have the net annual income of this nice little transaction with the company's money of $7,030 81. But supposing it is alleged that this purchase of bonds does not appear on the record. It makes no difference. It illustrates the principle, and only shows a transaction that the court can very readily see might occur, and one that is not consonant with the rules of fair dealing.

*James C. Marshall* and *John H. Walker*, for defendant in error.

There is but one assignment of error, and that is "the court erred in entering judgment for defendant," leaving the entire field open for discussion.

The plaintiffs' demurrer to the garnishee's answer can have no greater effect than a motion for judgment, hence the refusal of the court to give judgment in favor of plaintiffs therein will be no bar to a further proceeding in the cause, and is not final.

Then it becomes necessary to turn our attention to the answers of the garnishees—what they contain—the position they occupy in the case, and the effect of the demurrer. Proceedings on execution attachment are regulated by the act of 16 June, 1836. The act provides for the exhibiting of interrogatories to the garnishee, &c., to which he is required to make direct and full answers. If the garnishee admits indebtedness to the defendant, judgment is taken, &c. But if he does not, issue is to be taken and trial had upon the *scire facias*, and the jury to find what goods or effects, if any, were in the hands of the garnishee at the service of the attachment.

The interrogatories of the plaintiff and the answers of the garnishee form no part of the *pleadings* on the *scire facias*, but assume the character of a *bill of discovery* and answer thereto. If the garnishee denies assets in his hands, the plaintiff takes nothing by his bill; but is in no way precluded from proceeding in his case just as if no interrogatories and answers had been filed. Upon the trial before the jury the plaintiff may or may not, as he pleases, use the answers of the garnishee in *evidence*. But if he reads the answers of the garnishee in *evi-*

[Fox et al. *v.* Reed.]

*dence*, the garnishee may insist that the whole of his answers to the interrogatories shall be read, and may read any docu-- ment referred to in any answer. Sergeant on Attachments, 34.

"A plaintiff in a *scire facias* against a garnishee in foreign attachment, having required the defendant to answer interrogatories and read them to the jury upon the trial of the issue upon the facts stated therein, the answers must be taken as primary *evidence*, not requiring of the defendant other proof to establish them." *Erskine* v. *Sangston*, 7 Watts, 150.

Answers of the garnishee to interrogatories filed by plaintiff in foreign attachment cannot be received on the argument of a demurrer. *Brealsford* v. *Meade*, 1 Yeates, 488.

The decisions in the above cited cases settle this point conclusively, that the answers of the garnishee to interrogatories in foreign attachment, *form no part of the pleadings,* but occupy the character of *evidence*. As before said, the interrogatories assume the place of a bill of *discovery*, and the answers of the garnishee the same as an answer to such bill. If the defendant disclose nothing of use to the plaintiff, the bill and answer go for nothing, and the plaintiff proceeds with his cause in the usual way, as if no bill of discovery had ever been filed. *Hess* v. *Shorb,* 7 Barr, 231.

The demurrer in the case now before the court is nothing more nor less than a demurrer to *evidence*, and must be governed by the rules of law applicable to the demurrer to evidence.

The principle is, "that on a demurrer to evidence, every fact which the jury could infer in favor of the party offering it, from the evidence demurred *to,* was to be considered as admitted." *Cocksedge* v. *Fanshaw*, Doug. 119. The court has recognized the above rule in the case of *Commonwealth* v. *Parr*, 5 W. & S. 347.

It was held in the case of *Caldwell* v. *Stileman*, 1 Rawle, 215, "If evidence is admitted without objection, and there is a demurrer to it, this admits that the evidence was legal, competent, and true, and brings up only the effect of it on the right; every fact sworn to, or shown by written documents, is admitted to be true; and every fair inference from what is given in evidence is to be taken as proved." Apply that principle to our case, and where will the plaintiffs stand ? The answers of the garnishee are not only to be taken as true, but every legal inference that a jury could draw from those answers in favor of the garnishee, the court is required to give to the garnishee.

Mr. Reed, the garnishee in this case, says in his answer to the plaintiffs' third interrogatory, that he never loaned from the Erie Canal Company any of its money or funds, or any part thereof, nor had he at any time held said money or funds

[Fox et al. *v.* Reed.]

under any contract or agreement with the Erie Canal Company.

To the sixth interrogatory he answers and says, "That he was not indebted to the Erie Canal Company at the time of the service of the said attachment, or since, but that said company is, and has been for many years past, indebted to this respondent in the sum of two hundred thousand dollars and upwards, and that said company is insolvent." The truth of those answers admitted (and the demurrer unqualifiedly does so), where have the plaintiffs any case?

They may say that there are answers of the garnishee to some of the other interrogatories which in their opinion may conflict with those we have referred to. Nothing can be predicated upon that, because the demurrer admits the truth of the answers, and in case there was any apparent conflict in them, it would be in the province of the jury to reconcile them, or find which version was the true one; but the plaintiffs by their demurrer admit every inference in favor of the defendant that a jury could legally find, supposing this case had gone before a jury.

The plaintiffs, by demurring to the evidence, have placed this case in a shape to be considered just in the position we have last supposed. The answers of the garnishee, or at least so much of them as are in our favor, to give the case any *sense* or *standing*, must be supposed by them to be *evidence* given *by us* to a jury—because if it were the plaintiffs' evidence they could not demur to it. Of course the learned counsel for plaintiffs would not introduce an *absurdity* into practice. They must understand it to be a *demurrer* to *evidence* introduced by the garnishee. The law is conclusive on them, and we will not pursue this branch of the case any further.

Upon a *general* demurrer the party can only take advantage of defects in *substance;* and if the defect objected to be not clearly of that nature, *special* demurrer is the proper mode. 1 Chit. Pl. 664.

A general demurrer admits every fact that is substantially well pleaded, and a special demurrer admits those which are informally pleaded, if they are not *specially* shown for *cause* of demurrer.

Generally demurrer confesses things informally pleaded. *Commonwealth* v. *Primrose,* 2 W. & S. 407; *Ellmaker* v. *Franklin Fire In. Co.,* 6 W. & S. 445.

To the first plea the plaintiffs reply an *estoppel;* to the second *precludi non;* and to the third a *general* demurrer.

There is nothing in the plaintiffs' replication to the defendant's first plea of *nulla bona.* There is nothing like an estoppel in the case. The plaintiffs allege in their *scire facias* that

the defendant is indebted to the Erie Canal Company, or that he holds the money or effects of said company; he replies he does not; forming a direct issue on that point, strictly in accordance with the rules of pleading. The plaintiffs, to avoid that issue, allege that there is something in defendant's answers to the interrogatories put by plaintiffs to him, inconsistent with the plea of *nulla bona.*

We have already shown upon another branch of this case, that the answers form *no part of the pleadings*, but can only be used as *evidence*, and that wholly at the option of the plaintiffs, and so far as the pleadings are concerned, to be thrown out of the case. *Brealsford* v. *Meade*, 1 Yeates, 493; *Erskine* v. *Sangston*, 7 Watts, 150, fully sustains this position.

Defendant's second plea we pass.

The third plea is a special plea in bar. It admits an indebtedness from the garnishee to the defendant in the execution, the Erie Canal Company, but alleges that the Erie Canal Company is largely indebted to him over and above the sum due from him to said company, and that said indebtedness was on bonds of the said company due and payable prior to the service of said attachment, which he, the defendant, claimed the right to set off against the claim of the said canal company against him. To which plea the plaintiffs filed a *general* demurrer, and upon that the court below rendered judgment in favor of the defendant.

Let us apply these general rules to the case before the court. The plaintiffs demur generally to our plea, thereby admitting the truth of the facts alleged in that plea. If there are defects in *form* in it, the plaintiffs cannot take advantage of such upon their *general* demurrer.

The question presented by the writ, plea and demurrer, is this and nothing else: Can a garnishee in an execution attachment avail himself of the right of set-off, the same as if an action of debt or assumpsit had been brought against him by the defendant in the execution? The law is settled that he can.

"It is said the garnishee of a debt may plead anything against the plaintiff in the *scire facias*, that he could plead against his own original creditor, except the debt is not presently demandable; and even that may be pleaded by him in stay of execution. In no other respect does the attaching creditor stand on other ground than that of the creditor for whom he has been substituted by the attachment as a statute, assignment or execution." *Farmer's and Mechanic's Bank* v. *Little*, 8 W. & S. 219.

An attaching creditor stands in the shoes of a debtor, and any equities that could be set up against the latter, are equally available against the former. *Patton* v. *Wilson*, 10 Casey, 299.

[Fox et al. *v.* Beed.]

An attaching creditor can acquire no superior claim against the garnishee than his debtor had. *Riddle* v. *Etting*, 8 Casey, 412.

An execution attachment does not change the relations with which it interferes, further than to transfer the right of the defendant resulting therefrom. It interferes in no way with any right of the garnishee, but leaves to him all the right of *set-off defalcation or defence*, incident to the relations existing at the time of the service. *Myers* v. *Baltzell*, 1 Wright, 491.

The plea of set-off is well pleaded. The argument of the plaintiffs'. counsel is wholly applicable to *special* demurrer. But there is no defect in the *form* of our plea in bar; it is good both in *form and substance*. If the cause had gone to trial before a jury on that plea, and a verdict for the defendant, we submit if the judgment could be arrested or reversed on error for want of *substance* in the plea. The argument of the gentlemen on this point is. anything but sound and applicable. It is argued that the plea is bad because the garnishee did not describe the bonds by *dates, numbers, and amounts*, whether they bore interest or not. Such an argument upon a general demurrer to such a plea in this case, is scarcely entitled to an answer. It is perfectly clear that the garnishee in his plea of set-off to the attachment need not describe the evidence of debt he intended to set off with that accuracy that might seem to be required between the original parties where the set-off was to be made. It is fully sufficient for the garnishee in his plea to the attachment to set out so much as to enable the court to judge of the subject matter proposed as a set-off. The plea under consideration fully and amply does so, and the labored argument of the learned counsel goes for nothing at all. They have in a most remarkable manner jumbled up in their *argument* as well as their pleadings different matters which have no connection with each other and only calculated to confuse. After they have fully exhausted their ingenuity in mixing up their pleadings,. evidence, demurrers and arguments, losing sight of all distinctions on those different subjects, arguing supposed defects in matters of form upon a general demurrer, leave the record and indulge in a lecture on a convenient mode of making money in the traffic of the bonds of the Erie Canal Company. We are not disposed to follow them in their windings.

*Grant*, in reply.

Defendant's counsel have labored to prove that by our demurrer to defendant's answers, we admit the facts therein stated. We tried to convince them of this long ago. We put it in writ-

ing in our demurrer and filed it of record, March 28, 1861, and give it at length in our paper book on page 9. We admit the record as a whole. The answers, and defendant's affidavit are before the court, and they are to construe them as a whole, not in isolated parts and pronounce judgment on each part, but upon all together.

Defendant's counsel refer to *Brealsford* v. *Mead*, 1 Yeates, 493, to show that "the interrogatories and answers are mere matters of evidence to a jury, but can have no weight in the argument of a demurrer, and cannot be received."

In *Brealsford* v. *Mead*, foreign attachment had been issued against Mead, garnishee. Mead pleaded in abatement to the attachment the non-joinder of Fitzsimmons, his co-partner, to which plaintiffs replied. Defendants demurred to the replication, and plaintiffs joined in the demurrer. This was to test the quality of the replication, not the answers. Our demurrer is to the answers direct, and it seems a strange doctrine that the answers are not to be read and used in the argument. The gentlemen certainly could not have read the whole case. Its entire absence of applicability to the case under consideration, precludes the idea of its examination by counsel of their acute perceptions. And beside, the *Brealsford* and *Mead* case originated in 1783, and was probably under the statute of 4 Ann., and our proceeding is under the act of 1836, the 55th section of which provides that the interrogatories, and hence the answers, shall be filed of record. Hence we are of the opinion that the answers are to be treated like an answer to a bill in equity, and hence a part of the pleading, to be construed by the same rules as other pleading—that is, most strongly against the pleader.

Defendant has answered facts which, without doubt, make him the debtor of the canal company, but seeks to get out by saying he does not owe the company.

The law is well stated in *Fithian* v. *Brooks*, 1 Phil. Rep. 260 (8 Leg. Int. 230), as follows: "The established practice of the court is not to give a judgment against the garnishees, unless upon an express admission of assets, or at least the admission of such facts that the possession of assets necessarily results as a question of law." The same doctrine is held in 1 T. & H. 758.

Mr. Reed's answers and affidavit state such facts relative to the possession of assets as to make his liability to plaintiffs a *result* as a matter of law.

All the case was contained in the interrogatories, answers and affidavit of defendant. It was written evidence made by defendant, and its force and effect was to be construed by the court. It contained nothing for the jury to pass upon and

[Fox et al. *v.* Reed.]

hence the pleas were out of place. So the court below treated the case and were right in so doing. Our demurrer to the answers raised the whole question. That had first to be decided. If that was well founded it was an end to the case. The demurrer brings up the whole record, of which the interrogatories and answers, by force and virtue of the act of assembly, form a part. It of course *pro hac vice* admits the facts that are well pleaded and refers the question of their legal sufficiency to the court. There is a material defect in the *substance* of defendant's third plea. In fact, it is entirely wanting in this necessary requisite. It is a mere shell, worthless, absolutely, for the purposes for which it is attempted to be used. The defect being in a want of substance, by defendant's own confession, the general demurrer is correct. We say that it is correct, whether the defect is in substance or form. It is said, Chit. Pl. 662, " When the objection is a defect in matter of *form*, a *special* demurrer is still *permitted*"—barely *permitted*. A general demurrer would be better, but still the court will permit a special demurrer.

The sufficiency or insufficiency of a plea, can be determined only on demurrer, 2 Wil. 137 ; *Day* v. *Hamburg*, 1 Browne, 78.

Plaintiffs have always contended, in the language of Mr. JUSTICE STRONG, in *Reed* v. *Penrose*, 2 Grant's C. 488, that " the attachment is an equitable assignment of the thing attached ; a substitution of the creditor for the debtor to the latter's rights against the garnishee." *In re Baldwin's Estate*, 4 Barr, 248. To prove this doctrine defendant's counsel have cited several authorities, and there can be no doubt of the correctness of the position. This granted, what is the result? Beyond all doubt that plaintiffs have the legal right to insist upon the same accuracy in pleading, in both form and substance, that the canal company could do if they were plaintiffs. This being so, defendant's argument upon this branch of the case falls.

The opinion of the court was delivered, March 10th, 1862, by
LOWRIE, C. J.—There is no real difference between this case and that of *Reed* v. *Penrose*, 2 Grant, 485. The plaintiffs' demurrer to the garnishee's answers is not an improper form of setting the case down for hearing on the answers. It has no other purpose or effect. Then as to the garnishee's pleas. That of *nulla bona* is good for nothing when the plaintiff sets the case down for hearing on the answers. That the defendant had not been notified of the attachment can never be an issue to the jury, and the want of notice or service is cured by actual appearance. The third, that the garnishee holds bonds of the defendant to the amount of $300,000, due 1st January, 1850, and that he has a right to set off so many of these as will cover

[Fox et al. *v.* Reed.]

the money in his hands, is really no plea of set-off, for in order to be so it ought to be as special as a declaration in debt on the bonds, and should specify the very bonds on which a recovery is claimed by way of set-off. It specifies none of the three hundred or three thousand bonds which he claims to hold, and a judgment in his favor on such a plea would extinguish either all or none of the bonds. The plea is bad on general demurrer. And the garnishee loses nothing by this, for· he sets up the same defence in better form in his answers.

The whole case, therefore, depends upon the garnishee's answers, and as they admit funds in hand sufficient to pay the plaintiff, the only question is, are these funds liable, and in *Reed* v. *Penrose* we have decided that they are.

A majority of us are of opinion that the defendant, the canal company, cannot claim that its funds are exempt from the pro-cess of its creditors, because it needs them for the repair of its works, or has by resolution set them apart for that purpose. If resolutions could be so effective, no doubt they would always keep enough of them on hand.

A majority of us are further of opinion that the garnishee in this case has no legal right to set off the bonds, or any of them held by him, so as to satisfy or discharge the debt owed by him as depositary of the funds of the company, and that therefore he cannot set them up against any creditor of the company. It would be a breach of the confidence reposed in him as depositary, as president, and as co-corporator for him to take such an advantage of his position, and the law does not allow it.

Moreover so far as this and the former point are set up for the benefit of the company, the garnishee sets them up impro-perly, for they do not interest him as garnishee, and the com-pany has withdrawn all defence with its appearance.

Judgment reversed, and judgment for the plaintiffs against the garnishee for the sum of twenty thousand four hundred and seventy-eight dollars and seventeen cents and interest from this date, and all costs, and on the payment thereof the said garnishee shall be discharged from so much of his indebtedness to the defendant, the Erie Canal Company, on account of their moneys deposited with him, and record remitted for execution.

WOODWARD, J.—For the reasons I gave in *Reed* v. *Penrose*, I do not regard the corporate funds as attachable at the suit of creditors, but concur in the present ruling of the point as *res adjudicata*.

STRONG, J., dissents.

THOMPSON, J., having at one time been of counsel, took no part in the case.